UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KURT D. SHAFFER,

               Plaintiff,               CIVIL ACTION NO. 04 CV 74813 DT

          v.                      DISTRICT JUDGE BERNARD A. FRIEDMAN

COMMISSIONER OF           MAGISTRATE JUDGE VIRGINIA M. MORGAN
SOCIAL SECURITY

               Defendant.
_____/

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

The plaintiff, Kurt D. Shaffer, brings this appeal of the Agency's final decision denying

him Social Security disability insurance benefits before the federal district court.  Plaintiff claims

defendant's decision, as determined by the administrative law judge ("ALJ") and denied

reconsideration by the Appeals Council, lacked the requisite basis for denial of disability

because the ALJ's decision ignored substantial evidence of such disability.  As a result, plaintiff

seeks reversal granting award of benefits or remand of the Commissioner's decision denying him

benefits to the ALJ for further, appropriate consideration under 42 U.S.C. Section 405(g).  For

the reasons discussed in this Report, it is recommended that the defendant's motion requesting

summary judgment be granted, plaintiff's motion be denied, and the decision denying disability

benefits be affirmed.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff completed an application for disability insurance benefits ("DIB") or Social Security Income ("SSI") under Titles II and XVI of the Social Security Act, September 24, 2001 claiming an onset date of August 16, 2001.  (Tr. 47, 62, 272)  The field office report noted plaintiff's previous filing for DIB in 1994 was denied at level 2.  (Tr. 57)  Plaintiff claimed disability due to right arm biceps (partial) tear, gout and arthritis of right ankle and knee, lower back pain along with a history of seizures.  (Tr. 33, 69)  Plaintiff's initial claim for DIB was denied on May 2, 2002.  (Tr. 33)  Plaintiff subsequently requested a hearing before the ALJ on May 10, 2002.  (Tr. 38)  Plaintiff appeared before the ALJ, Regina Sobrino, on July 2, 2003. (Tr. 292-336)  During that hearing, the plaintiff testified as to his physical capabilities and illnesses and vocational expert ("VE") Pauline McEachin provided testimony related to plaintiff's inability to perform in his past jobs and the existence of other jobs available to an individual with plaintiff's background and physical limitations.  (Tr. 296-336)[1]

### A.  Plaintiff's Background – Education and Work History

Plaintiff's age at the time of the hearing was 41.  He had attended high school, but made conflicting statements at varying points in the record about whether he graduated and received

---

[1] Plaintiff's age at the time of the hearing was 41.  He had attended high school, but reportedly had not graduated.  (Tr. 296, 323)  Plaintiff had also taken some classes, particularly welding, at Washtenaw Community College.  (Tr. 68)  Plaintiff's work history consisted of unskilled light and medium  exertional level tasks as a clerk, assembler, welder and buffer.  (Tr. 317)

his high school diploma.[2]  (Tr. 296, 323)  He testified that he had not received any special

education services.  Plaintiff had also taken some classes, particularly welding, at Washtenaw

Community College.  (Tr. 68)  Plaintiff's work history consisted of unskilled tasks which

included light and medium levels of physical exertion as a clerk, assembler, welder and buffer.

(Tr. 317)

### B.  Medical History

#### 1.  Pre-Onset History

Prior to onset date, plaintiff's medical history indicates a series of complaints of a work-

related injury to his left knee which occurred in April 1993.  (Tr. 192)  An MRI was conducted

in August 1993 which was normal with slight effusion; however, Dr. Morris, the treating

orthopedic specialist, noted crepitation which accounted for plaintiff's complaint of a popping

sensation in the left knee.  (Tr. 187)  Plaintiff continued to complain of left knee pain which Dr.

Morris ascribed to the April contusion injury.  (Tr. 183)  Finally, in January 1994, during a

follow up visit for continued pain, plaintiff expressed an interest in an arthroscopic procedure to

Dr. Morris and the procedure was conducted in March 1994.  (Tr. 181, 128)

Another notable pre-onset condition is plaintiff's history of seizures.  Dr. Robert J. Levy

was the neurologist plaintiff saw for this condition and described a routine follow up visit in

---

[2] However other references in the record indicate that plaintiff did receive diploma.  (Tr. 167, Social History portion of Patient Health Questionnaire dated April 30, 2000 indicating "Level of Education" as "12 Graduation Diploma." and Tr. 145, Vocational Evaluation report by Dr. Rosenbaum stating, "The client graduated from Lincoln Consolidated High School.  He was held back for one year in kindergarten.  He was slow primarily in the area of mathematics.  He managed to graduate with a GPA of "C" and was never in a special education curriculum.")

June of 1994 as clarifying the proper dosage of Dilantin required to control plaintiff's complex

partial seizure disorder. (Tr. 238) No other mention of this condition occurs until a letter from

Michigan Rehabilitation Services ("MRS") in January 1999 requesting information about the

seizure disorder condition from Dr. Levy. Dr. Levy's response indicates that he had last seen the

plaintiff (at that time) in June 1994, when Mr. Shaffer was taking the prescribed phenobarbitol to

control the condition. (Tr. 202)

Dr. Morris' records indicate that in May 2000, plaintiff presented with new complaint of

pain in his right elbow. (Tr. 161) Subsequently in July 2000, plaintiff's records indicate visits

for right knee pain which Dr. Morris assessed as resolving gouty arthritis and further description

of plaintiff's right elbow pain as a partial right biceps muscle tear. (Tr. 156)

Subsequently, the record indicates increasing occurrence of weight-related health

problems. Immediately pre-onset, the record indicates a follow up visit for hypertension August

3, 2001, during which Dr. Jean Malouin recommended plaintiff begin taking medication to

control the condition and engage in a lipid lowering diet. (Tr. 200)

### 2. Post-Onset Medical History

Occupational Physical Capacities Assessment and exam conducted on August 21, 2001

by Mary Pomerville, N. P.[3] The completed assessment noted plaintiff's ability to sit, stand, walk

and lift up to 10 pounds "sometimes" (defined as continuously for up to two hours or

occasionally up to six hours) but completely restricting plaintiff from lifting greater amounts,

---

[3] Assessment form signed by Mary Pomerville, F.N.P. (Tr. 201) Medical transcription
contained typewritten name of both Mary Pomerville, N.P. and G. Michael Jasbeck, M.D.
though only contains handwritten initials "MP." (Tr. 207)

squatting, crawling, kneeling or climbing.  (Tr. 201, 207)  The transcript of the exam noted full ranges of motion in arms and knee without crepitation, limited motion at hip.  Doctor's impression described as degenerative joint disease in left knee and gouty arthritis in right knee along with decreased capacity of right arm (strength).  (Tr. 207)  Both the physical assessment form and transcription of doctor's notes indicate that a neurological assessment was ordered. (Tr. 201, 207)

Subsequently, on August 29, 2001, plaintiff's neurological assessment was completed by Dr. Levy.  Dr. Levy indicated that he last saw plaintiff in October 1994 and described his seizure disorder as consisting of complex partial seizures which were well controlled by Phenobarbital. (Tr. 236)  Dr. Levy explained that plaintiff "inadvertently discontinued Phenobarbital on his own in 1994" but did not recommend re-commencing anticonvulsant medication due to long period without seizures.  (Tr. 237)  Ultimately, however, Dr. Levy indicated the history of seizures restricted plaintiff from the welding position for which he was being evaluated.  (Tr. 237)  Dr. Levy saw plaintiff again for a referral by Dr. Jasbeck in May 2002 which is discussed below.

A visit with Dr. Karen March, October 1, 2001, indicated continuing treatment for leg and knee pain during which she indicated weight loss of 30 pounds to alleviate both hypertension and arthritis.  (Tr. 206)  Additionally, Dr. March's notes indicate impressions of ichthyosis vulgaris (dermatological condition) and obesity.  (Tr. 206)  Plaintiff followed up with Dr. Jasbeck in February 2002 for gout, foot and ankle pain.  (Tr. 114)  He began seeing Dr. Donald Martin for pain and arthritis on June 3, 2002.  (Tr. 88)

- 5 -

Dr. Jasbeck referred plaintiff to Dr. Levy for an update of his seizure disorder diagnosis on May 10, 2002. (Tr. 235)  Dr. Levy's report to Dr. Jasbeck acknowledges plaintiff's last seizure in June, 2001, but no further seizures since resuming treatment with Phenobarbital in December 2001. (Tr. 235)  Dr. Levy reports continued diagnosis of complex partial seizure disorder with plaintiff "stable on Phenobarbital." (Tr. 235)

Plaintiff was referred to Dr. Levy again, November 22, 2002 by Dr. Martin related to plaintiff's complaints of carpal tunnel injury. (Tr. 232)  Dr. Levy's report found "[e]vidence of entrapment neuropathy involving the median nerve . . ., as seen in carpal tunnel syndrome, was present bilaterally. . . ." (Tr. 232)  He also noted "mild evidence of a remote radiculopathy involving the left C6 and C7 anterior myotomes was present."[4] (Tr. 232)  No further impressions noting severity or physical affects of these findings was included in the report.

### C. Occupational Evaluations

On July 19, 1994, the plaintiff underwent a vocational evaluation by Charles Rosenbaum, Ph.D., Licensed Psychologist (referred by Mr. Terry Rocheleau from MRS).[5] (Tr. 144)  Dr. Rosenbaum utilized the Wechsler Adult Intelligence Scale – Revised to determine plaintiff's Verbal IQ of 79, Performance IQ of 95 and Full Scale IQ of 84. (Tr. 146)  Further, Dr. Rosenbaum assessed plaintiff's achievement levels according to the Wide Range Achievement

---

[4] Radiculopathy - disorder of the spinal nerve roots. *Stedman's Medical Dictionary*, 1484 (Marjory Sprayear ed., 26th Ed., Lippincott, Williams & Wilkins 1995).  Myotomes - the muscles innervated by one segmental spinal nerve. *Id.* at 1171.

[5] Vocational Evaluation report dated August 10, 1994.

Test – Revised as 9th grade equivalent Reading, 7th grade equivalent in Spelling and Arithmetic.
(Tr. 146-47)  Dr. Rosenbaum concluded that Mr. Shaffer "function[ed] within the low-average
range of intelligence with average performance skills and borderline language development" and
"[if Mr. Shaffer] is to enter an academic environment, he will require assistance with
intermediate to more difficult reading, spelling, and arithmetic."  (Tr. 147)

On November 11, 2002,[6] plaintiff saw Dr. Michael Kelly an occupational medicine
specialist at Sparrow Occupational Health Services.  (Tr. 224)  This consultation resulted from a
family referral by plaintiff's brother-in-law, who suggested and paid for the visit.  (Tr. 313)  Dr.
Kelly's report contained a section titled "Review of Past Medical Records" indicating the dates
of a handful of x-ray reviews showing arthritic and osteoarthritic changes to right foot, knee,
elbow and shoulder; stated evidence of organic brain syndrome and mental retardation;[7] and
mentioned plaintiff's treatment for partial complex seizures.  (Tr. 225)  Dr. Kelly concluded
mainly:  "Mr. Shaffer is unfit for any active employment and is totally and permanently
impaired, particularly given his background, his educational, and his occupational experiences."
(Tr. 226)  Dr. Kelly's basis for this conclusion appears to be the following findings included in
his report:

> Mr. Shaffer has several medical problems.  He has a long history
> of seizure disorder and organic brain syndrome, or cognitive
> impairment as a result of anoxic brain damage at birth.  He is now
> moderately impaired.  He is not fit to perform any tasks that

---

[6] Dr. Kelly's report on Sparrow letterhead is dated November 19, 2002.

[7] This is the only characterization in the record of plaintiff's cognitive abilities as constituting mental retardation.

- 7 -

require independent thinking and processing and is not fit for any safety sensitive tasks or evaluations. He is frequently not fit to drive, as it does appear from records that his seizure activity remains marginally controlled at best.

There are rather serious pulmonary limitations, which cause rather severe limitations. He is unfit for any physically demanding activities and would only be fit for office of [sic] desk type work. The cognitive impairment makes office work impossible. There is extensive evidence of osteoarthritic problems involving many joints and areas. He is fit to lift light weights to his waist but is unfit for tasks require [sic] repetitive use of the hands. There is loss of dexterity to the hands as witnessed by writing tasks that were accomplished. He is not fit for laboring work of any kind.

(Tr. 226)

### D.  Social Security Disability Evaluations

In preparation for the Commissioner's initial determination regarding plaintiff's claim for disability benefits, defendant ordered an independent internal medicine evaluation, residual functional capacity assessment, and psychiatric review.[8] These reports were completed in late February through early April 2002.

Dr. S. L. Schuchter conducted the independent internal medicine exam and evaluation on February 14, 2002 noting the doctor physically examined plaintiff and that Dr. Levy's August 2001 report was available for consideration in the evaluation.  (Tr. 242)  Dr. Schuchter noted plaintiff's complaint of pain in left ankle and swelling, periarticular thickening of the knees and

_____

[8] Monarch Medical Services internal medicine report of S. L. Schuchter, M.D., FACP (Tr. 242-46), Physical Residual Functional Capacity Assessment by S. A. Daniel, M.D. (Tr. 247-54), and Psychiatric Review Technique by Charles Overbey, M.D. (Tr. 257-70)

- 8 -

some crepitation of both knees.  (Tr. 243)  Further noted good strength in right arm, Tinel's sign[9]

negative, grip 42 kg on right and 46 kg on left, and that plaintiff was able to pick up coins with

both hands.  (Tr. 244)  Dr. Schuchter concluded:

> Mr. Kurt Shaffer is status post tear of the right biceps.  He has
> degenerative joint disease of the knees and possibly of the hips.
> He has recurrent gout with probable acute gout I the left ankle
> currently.  He has obesity.  He has a history of seizures.  He has
> low back pain.

(Tr. 244)

On March 18, 2002, Dr. S. A. Daniel conducted a Residual Functional Capacity

Assessment ("RFCA") and reported the following limitations based on all evidence available in

the plaintiff's file.  (Tr. 247)  Dr. Daniel noted exertional limitations of:  frequent lifting of 10

pounds with occasional lifting of 20 pounds; standing and walking two hours of an eight-hour

work day; limitation against constant pushing and pulling in the upper extremities, while noting

plaintiff's gout in toes and ankles, degenerative joint disease and knees and possibly hips, low

back pain, varicose veins in legs and decreased range of motion in spine, hips, knees and ankles.

(Tr. 248-49)  Next, Dr. Daniel's postural limitations noted capacity for occasional climbing of

ramp/stairs, balancing, stooping, kneeling, crouching and crawling with a total restriction from

climbing ladders or scaffolds.  (Tr. 249)  The RFAC included manipulative limitations providing

limited, occasional (though not frequent) overhead reaching in right arm with unlimited left arm

overhead reaching, limited handling which assessed handling and fingering as possible

---

[9] Tinel's sign (DTP), a sensation of tingling, or of "pins and needles," felt in the distal extremity
of a limb when percussion is made over the site of an injured nerve; it indicates a partial lesion
or early regeneration in the nerve.  *Stedman's Medical Dictionary* at 1619.

frequently but not constantly (noting intact right hand grip of 46 pounds) which could be

accomplished with breaks.  (Tr. 250)  The RFAC included environmental limitations requiring

avoiding concentrated exposure to vibration (with a note included that plaintiff was currently

seizure free).  (Tr. 251)

      Further, Dr. Daniel provided substantial handwritten notes explaining his assessment of

the plaintiff's symptoms, statements of treating/examining sources and explaining why his

conclusions differed from treating/examining sources.  Dr. Daniel's notes about symptoms and

severity noted the following:[10]

> ADL [activities of daily living[11]] and MER [medical evaluation
> report] plays ball and does gardening 30 minutes; yard work 30
> minutes daily in summer; drives daily – short distances; occasional
> cooking; weekly cleaning – small jobs; plays cards, board games
> and shoots pool; shops weekly - wheelchair; plays cards and visits
> weekly; model building daily; can walk 300 feet, stand 10 minutes,
> carry 10 pounds, sit 20 minutes; sleeps 8 hours; TV 5-6 hours;
> movies monthly; the extent of limitations alleged is not fully
> supported by MER, ADL or by MSS [mental status schedule[12]] by
> Dr. Morris or neurologist; depression and physical overlay – is
> only on Indocin and Alleve [sic], no heavy duty pain meds

(Tr. 252)  Thereafter, Dr. Daniel cited a restriction by Dr. Morris in October 2000 of no heavy

lifting and right arm lifting limited to ten pounds.  He noted a May, 2001 Michigan Rehab

[Physical Capacities Assessment] (Tr. 201) was given by a nurse practitioner not an M.D. and it

restricted his standing, sitting and walking continuously up to two hours/day, or occasionally up

---

[10]Translated from Dr. Daniel's handwritten notes.

[11]Defined in the "Common Medical Abbreviations" available at www.aipge.com/article711.html.
[12]Definition acquired from www.pharma-lexicon.com.

to six hours/day; no lifting over 25 pounds, squatting, crawling, kneeling, climbing and stair

climbing; and limited pushing, pulling, grasping and reaching over shoulder and bending

continuously up to two hours/day or occasionally up to six hours/day.  Dr. Daniel also noted a

neurologist's finding that plaintiff can return to work.  (Tr. 253)  Dr. Daniel's report continues:

> weight given to the physician restrictions; controlling weight not
> given to the nurse's statements as no M.D. signature and also, no
> climbing, no crawl and no kneel is not compatible [with] his ADL.
> Could, has been doing them occasionally.  Tinel's negative, grasp
> 42 lbs. [sic – kg] . . .

(Tr. 253)

Finally, Dr. Charles Overbey, conducted a psychiatric review for consideration during

plaintiff's disability determination.  Dr. Overbey's summary showed his finding that plaintiff

had Category 12.02 Organic Mental Disorder specifically termed a "Learning Disability" and

that this impairment was not severe.  (Tr. 257)  Dr. Overbey cited the August 10, 1994 psych

evaluation (Dr. Rosenbaum's), specifically referring to the IQ results and diagnosis of

developmental learning disability associated with seizures as substantiation for those findings.

(Tr. 258)  In Section III of his report, Dr. Overbey rated the plaintiff's functional limitations as

mild restrictions to his activities of daily living, mild difficulty maintaining social functioning,

and mild difficulty maintaining concentration, persistence or pace.  (Tr. 267)

**III. STANDARD OF REVIEW, EVIDENCE AND BURDEN OF PROOF**

**A.  Standard of Review**

The statutory provisions which establish district court review of the Commissioner's

decisions regarding disability claims by the filing of a civil action are found in 42 U.S.C.

- 11 -

Sections 405(g) and 1383(c)(3).  In pertinent part, they state that "[t]he findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive."  42 U.S.C. §§ 405(g), 1383(c)(3) (2000).  The Supreme Court has defined

substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The Sixth Circuit has

further provided that this standard demonstrates "more than a scintilla of evidence but less than a

preponderance."  *Brainerd v. Sec. Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The reviewing court may "not review the evidence de novo, make credibility determinations []or

weigh the evidence."  *Id.* (citing *Reynolds v. Sec. Health & Human Servs.*, 707 F.2d 927 (6th Cir.

1983)).  Therefore, the court's task is to determine only whether the ALJ's decision is supported

by substantial evidence, not whether "[the] evidence could support a decision the other way."

*Cotton v. Sullivan*, 2 F.3d 692, 695 (6th Cir. 1993) (citing *Casey v. Sec. of Health & Human

Servs.*, 987 F.2d 1230, 1233(6th Cir. 1993)).  Simply stated, the court will not substitute its own

decision regarding the facts in the record over that of the fact finder, in this case the ALJ.

### B.  Burden of Proof and Evidence of Disability

The Sixth Circuit in *Casey* also held "[a] claimant bears the ultimate burden of

establishing the existence of a disability."  *Id.*  The Commissioner considers the claimant's proof

of disability utilizing the sequential evaluation process detailed below.

> Steps in evaluating disability. We consider all evidence in your
> case record when we make a determination or decision whether
> you are disabled.  When you file a claim for Supplemental Security
> Income disability benefits and are age 18 or older, we use the
> following evaluation process.  If you are doing substantial gainful
> activity, we will determine that you are not disabled.  If you are

- 12 -

not doing substantial gainful activity, we will first consider the
effect of your physical or mental impairment; if you have more
than one impairment, we will also consider the combined effect of
your impairments.  Your impairment(s) must be severe and meet
the duration requirement before we can find you to be disabled.
We follow a set order to determine whether you are disabled.  We
review any current work activity, the severity of your
impairment(s), your residual functional capacity, your past work,
and your age, education, and work experience.  If we can find that
you are disabled or not disabled at any point in the review, we do
not review your claim further.

20 C.F.R. § 416.920(a) (2001) (the same process detailed for DIB in § 404.1520(a)).

## IV. ANALYSIS

### A.  ALJ's Findings in the Disability Determination

The ALJ made findings of fact are reproduced in part below.  First, the ALJ found that

plaintiff had not engaged in substantial gainful activity since the alleged onset date (August 16,

2001).  Next, the ALJ summarized the plaintiff's impairments, their effects on his capacity to

work, and his residual functional capacity:

3.  Objective medical evidence demonstrates that obesity,
degenerative joint disease of the knees and hips, the residuals of a
right biceps muscle tear, bilateral carpal tunnel syndrome, a
seizure disorder, restrictive pulmonary disease, a history of a
learning disability, and history of alcohol abuse (in remission)
impose significant limitations upon the claimant's ability to work
and are severe impairments, as that term is defined in the
applicable regulations.  However, the claimant does not have an
impairment or combination of impairments that meets or equals in
severity any impairment listed in Appendix 1 of the Social
Security regulations.

4.  The medical evidence documents the existence of impairments
that can reasonably be expected to produce pain and decreased
tolerance for detailed or complex tasks.  However, the claimant's
allegations of the intensity, persistence, and functionally limiting

- 13 -

effects of his symptoms are not fully substantiated by objective medical or other evidence.

5.  The claimant has the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently, with no pushing or pulling.  The claimant can stand/walk two hours per eight-hour work day and sit at least six hours per eight-hour work day.  He should have the opportunity to alternate position at will.  The claimant can occasionally climb stairs and bend.  He cannot crawl, crouch, kneel, or climb ladders, ropes or scaffolds.  He should not perform overhead work or perform work that requires the operation of foot or leg controls.  He can write intermittently, for no more than a total of 1/3 of an eight-hour work day.  He should not be exposed to vibration or hazards, or engage in commercial driving.  He should have a clean air environment.  He can perform frequent, but not constant, handling and fingering.  He is limited to performing simple, routine work.

6.  The above limitations preclude the claimant from performing his past relevant work.

7.  The claimant was born on November 29, 1961.  He has a 12th grade education.  His past relevant work is unskilled.

8.  Based upon an exertional capacity for sedentary or light work, Rules 201.27 and 202.20 of Appendix 2 of the regulations would direct a finding that the claimant is not disabled.

9.  Although the claimant's exertional limitations do not allow him to perform the full range of light or sedentary work, using Rules 201.27 and 202.20 as a framework for decision-making,[13] there are

_____

[13]Rule 201.27 refers to Subpt. P. § 201.00(h) which describes the exceptional circumstance where individuals under age 45 may be found "disabled" despite Rule 201.17's lack of direct application to such individuals.  Rule 201.17 provides that individuals aged 45-49, with education classified as "illiterate or unable to communicate in English," with previous work experience of "unskilled or none" are considered disabled under "Table No. 1 - Residual Functional Capacity:  Maximum Sustained Work Capability Limited to Sedentary Work as a Result of Severe Medically Determinable Impairment(s)."  Section 201.00(h) also provides: "However, the inability to perform a full range of sedentary work does not necessarily equate with the finding of "disabled."  20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00(h) (2001).

- 14 -

> a significant number of sedentary jobs in the national economy that
> he could perform.  Examples of such jobs include video
> surveillance monitor, information clerk, ID clerk, visual inspector,
> packer/sorter, inspector, cashier, and dispatcher.  Vocational expert
> testimony establishes that these jobs exist in significant numbers in
> regional economy.

(Tr. 25)

The ALJ's findings detailed above are supported by substantial evidence.  The consistent, significant findings of treating and examining physicians are clearly incorporated into finding number three above.  The ALJ clearly indicates that while objective medical findings have been considered, the claimant's subjective allegations regarding the persistence and limiting effects created by these objective medical conditions has been discounted to the extent that it is not supported by consistent medical evaluations of those limitations upon claimant's residual functional abilities in finding number four.  The ALJ in finding number five demonstrates that she relied upon substantial, objective medical evidence in framing the claimant's residual functional capacity by including all consistently reported limits on the plaintiff's physical capacity to engage in particular types of activity.  Therefore, the ALJ's finding that plaintiff cannot engage in his past relevant work in number six is also sufficiently supported.  Proceeding to the next step in the evaluation in findings seven and eight, the ALJ ascertained the plaintiff's age, education and previous work experience in order to apply the criteria from Appendix 2 (20 C.F.R. Pt. 404, Subpt. P) to make a preliminary determination that plaintiff was not disabled according to those criteria for "Residual Functional Capacity:  Maximum Sustained Work Capability Limited to Sedentary Work as a Result of Severe Medically Determinable Impairment(s)."  As FN12 indicates, the regulation, while allowing deviation from the Table 1

- 15 -

metrics in Appendix 2, does not require such exceptions if sufficient evidence shows a significant number of available jobs remain which accommodate the claimant's restrictions.  In finding number nine, the ALJ explained that the VE had identified a number of jobs which were available to plaintiff considering his various conditions' limiting effects.  The ALJ considered the testimony of the VE, based upon the residual functional assessment by Dr. Daniel which was further founded upon all record evidence available in March 2003.

The court finds that the ALJ supported her findings at each step in the disability determination with substantial evidence.  Therefore, unless one of plaintiff's specific allegations of error discussed below are upheld as credible, the defendant has demonstrated the ALJ's findings are properly characterized as the "final" decision regarding the plaintiff's disability claim.

**B.  Plaintiff's Claims of ALJ Error Which Support Reversal or Remand**

The plaintiff's appeal states three main claims of error which he encourages as sufficient bases for reversal or remand of his claim.  The individual claims of error are that:  1) ALJ disregarded 100% of the medical evidence; 2) ALJ used her "road-sign" test and "laundry" test to find the plaintiff's condition better than his doctors reported; and 3) ALJ's hypothetical question to VE totally contradicted the evidence.

First, plaintiff alleges the ALJ disregarded 100% of the medical evidence.  Because the ALJ included findings which incorporated all medical conditions provided in the plaintiff's medical records, the court finds this allegation to be without merit.

- 16 -

However, to the extent that finding number seven relates to plaintiff's allegation that the ALJ failed to consider his learning disability when determining his level of education for the purpose of assessing his residual functional capacity, the court addresses it here.  Plaintiff alleges the ALJ substituted her own findings from questions posed to plaintiff at the administrative hearing for Dr. Kelly's occupational assessment conclusions in November, 2002.  Finding number seven, though, merely characterizes plaintiff's level of education similar to the language found in the Table No. 1, Residual Functional Capacity for Sedentary Work.  20 C.F.R. Pt. 404, Subpt. P, App. 2.  Finding number nine, however, indicates that the ALJ, while considering plaintiff's learning disability (stated in finding number 3), attached significance to the distinction in Table 1 between a claimant with a 12th grade education under Rule 201.27 (deemed not disabled if a high school graduate and unskilled) and a claimant, illiterate or unable to communicate in English under Rule 201.17 (as identified from the Table 1's FN 4 cross reference to the § 201.00(h)(3) exception allowing for a finding of disability in some cases under that rule where claimant was restricted from the full range of sedentary work).  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(h) and Table 1.  Further, Dr. Overbey's assessment of plaintiff's learning disability as "not severe" and characterization of his functional limitations as "mild" also support the ALJ's usage of the "12th grade" level of education for this purpose.  (Tr. 257, 267)

Second, plaintiff alleges the ALJ used her "road-sign" test and "laundry" test to find the plaintiff's condition better than his doctors reported.  Further, he asserts that the ALJ failed not only to give controlling weight to treating physicians' opinions, but also to give proper weight to

- 17 -

examining physicians' opinions.  Since the physical limitations from Dr. Morris and other

treating physicians are incorporated into the ALJ's findings, the court understands this allegation

to assign error primarily for the ALJ's failure to incorporate all of Dr. Kelly's vocational

assessment conclusions into her findings.  Plaintiff seems to claim that Dr. Kelly's conclusions

should be afforded controlling weight in the ALJ's determination of his physical capacity.

However, the court finds this argument also without sufficient basis for two reasons.  First, Dr.

Kelly was not a treating physician, therefore his findings should be weighted equally with

remaining examiners' medical conclusions, to the extent they are consistent with the other

substantial medical evidence.  *See Sigler v. Sec. of Health & Human Servs.*, 892 F. Supp. 183,

187 (E.D. Mich. 1995) (treating physician's opinion given "controlling weight" when supported

by medically acceptable clinical/diagnostic procedures and not inconsistent with other

substantial evidence).  Second, his findings were inconsistent with substantial evidence from

evaluations conducted by other examiners.  For example, as previously stated, the previous

medical history recited by Dr. Kelly deviated from Dr. Rosenbaum's finding of an organic brain

disorder or learning disability to state that plaintiff suffered mental retardation.

As for the allegation that the ALJ used her own "tests" at the hearing to disregard the

overwhelming medical evidence, the court also fails to find this argument compelling.  The ALJ

incorporated the various treating and examining physicians' conclusions into her findings which

indicate that great weight was assigned to those medical findings which were consistent

throughout the medical record.  Additionally, just as the RFCA form instructed Dr. Daniel to

consider *all evidence* in the file in reaching his reasoned conclusion about the plaintiff's residual

- 18 -

functional capacity,[14] the ALJ in her fact-finding role during the administrative hearing was

charged with considering all evidence in the file supplemented by her questioning of the plaintiff

and VE at the administrative hearing.  Because Dr. Daniel in his role did not have the

opportunity to question the plaintiff regarding his alleged limitations, the court finds the ALJ

properly considered his testimony in reaching her decision about his claim.  The court finds that

the ALJ did not use these purported "tests" as substitutes for objective medical evidence, but

rather to assess the credibility of plaintiff's allegations regarding the physical limitations these

objective medical conditions placed upon him.

Finally, plaintiff alleges that ALJ's hypothetical question to VE totally contradicted the

evidence.  The ALJ presented the following hypothetical to the VE for her consideration in

determining the availability of other relevant work at the administrative hearing:

> [P]lease assume a person who has past-relevant work as an
> assembler and as a welding machine operator as you have
> identified. . . .  Assume that the hypothetical individual was born in
> 1961 and has a 12th-grade education.  Assume that the
> hypothetical individual is limited to lifting and carrying a
> maximum of 20 pounds occasionally and 10 pounds frequently.
> Assume that the individual cannot push or pull.  Assume that the
> individual is limited to standing and walking a maximum of two
> hours in an eight-hour workday.  The individual is able to sit for at
> least six of eight hours and should have the opportunity to alternate
> position at will.  Assume that the individual can occasionally bend
> and occasionally climb stairs.  The individual cannot climb
> ladders, ropes, or scaffolds; cannot crouch, kneel, or crawl.  The
> individual should not operate foot or leg controls, should not
> perform overhead work.  The individual can write intermittently
> but for not more than a total of one-third of an eight-hour workday.
> The individual can frequently but not constantly handle and finger.

---

[14]Form SSA-4734-BK (1-89).  (Tr. 247)

> The individual should not engage in commercial driving.  Assume
> that the individual needs a clean work environment.

(Tr. 319-20)  Based on the plaintiff's medical history, and occupational and disability

evaluations detailed above, the court finds that the hypothetical is supported by substantial

evidence from Doctors Morris, Rosenbaum, Levy, Schuchter, Daniel, Overbey, along with N.P.

Pomerville; therefore, plaintiff's claim that it went totally against the evidence is without merit.

For these reasons, the court finds that the ALJ's findings and conclusion are supported by

substantial evidence.  While noting that some evidence in the record *might* support the *possibility*

of a different conclusion, the court does not conclude that the ALJ erred in her determination

confirming the initial denial of disability benefits to plaintiff.  The ALJ complied with the

regulatory procedure and based her conclusion on substantial evidence derived from the record

of plaintiff's claim and testimony provided during the administrative hearing on July 2, 2003.

## V.  CONCLUSION

The court recommends the district court grant defendant's motion for summary judgment

in her favor.  The ALJ's determination was supported by substantial evidence that plaintiff's

condition, while imposing significant limitations and constituting severe impairments which

precluded plaintiff from engaging in his past relevant work, did not exclude him from the ability

to perform other substantial gainful activity.  The plaintiff's prayer that the district court award

disability benefits or remand to the ALJ for reconsideration of his claim, should therefore be

denied.

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to act within ten (10) days of service of a copy hereof as

provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec. of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *U.S. v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec. HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fedn. of Teachers Loc. 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.


 s/Virginia M. Morgan
VIRGINIA M. MORGAN
UNITED STATES MAGISTRATE JUDGE

Dated:   July 25, 2005

| **Proof of Service** |
| --- |
| The undersigned certifies that a copy of the foregoing report and recommendation was served on the attorneys of record  by electronic means or U.S. Mail on July 25, 2005. |
| s/Jennifer Hernandez<br>Case Manager to<br>Magistrate Judge Morgan |